# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 6:25-mc-934 |
| Target Cell Phone 1 and Target Cell Phone 2, currently located on the premises of the Drug Enforcement Administration, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Target Cell Phone 1 and Target Cell Phone 2, currently located on the premises of the Drug Enforcement Administration, as further described in Attachment A hereto,

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1) (A)(vi), (b)(1)(A)(viii), (b)(1)(B) (ii) and 846. | Conspiracy to distribute and Possessing with the Intent to Distribute Controlled Substances. |

The application is based on these facts:

See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Kristofer Strubel by Phone
*Applicant's signature*

Task Force Officer Kristofer Strubel, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone at _9:35___ a.m./p.m. *(specify reliable electronic means)*.

Date: _8/15/25_____

_____
*Judge's signature*

City and state:  Medford, Oregon

Mark D. Clarke, United States Magistrate Judge
*Printed name and title*

ECF  1

DISTRICT OF OREGON, ss:            AFFIDAVIT OF KRISTOFER STRUBEL

**Affidavit in Support of an Application Under Rule 41
for a Warrant to Search and Seize Evidence Including Digital Evidence**

I, Kristofer Strubel, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.      I have been employed as a State Trooper with the Oregon State Police since August 2015.   I continue to be employed by the Oregon State Police assigned as a Task Force Officer (TFO) assigned to the Drug Enforcement Administration (DEA) Eugene Resident Office since January 2024. My job assignment includes, but is not limited to, the investigation of violations of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856, which includes the detection, identification, and apprehension of those individuals involved in narcotics trafficking offenses.   My training and experience include completion of Basic Narcotics Investigations, and I have both my Basic and Intermediate Certification through the Department of Public Safety Standards & Training.   Additionally, I have participated in numerous controlled substance investigations since my employment with the DEA as a case agent and surveillance agent.   I have consulted and conversed with numerous other agents from various local, state, and federal agencies on drug cases of all types.   I have interviewed and operated informants, executed search warrants, arrested, and interviewed subjects involved in the smuggling and distribution of narcotics, conducted physical surveillance, and utilized electronic and video surveillance.   I am familiar with investigations of Drug Trafficking Organizations (hereinafter, "DTOs"), including identifying methods of importation and distribution of controlled substances, and how controlled substances are manufactured,

**Affidavit of (Name)**                                                                          **Page 1**

consumed, packaged, marketed, smuggled, and distributed.   I am also familiar with various tactics used by DTOs to import drugs into the United States, communicate with members of the DTOs, and arrange for transportation and distribution of drugs.

2.       I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and examination of cellular telephones:

- **Target Cell Phone 1:** A light gray Samsung cellular phone inside a blue case that had a Captain America Shield and the words "CAPTAIN AMERICA" under it, seized from Campos Roman, Jesus hereinafter "Campos Roman" on July 30, 2025 (hereinafter, Target Cell Phone 1),

- **Target Cell Phone 2:** A black Samsung Cellular phone inside a black case that had "Go To" inscribed at the bottom with a lock screen showing a fingerprint emblem and the words "LAGG" followed by a heart emoji, seized from Freites-Mosquera, Eduar hereinafter "Freites-Mosquera" on July 30, 2025 (hereinafter Target Cell Phone 2),

Target Cell Phone 1 and Target Cell Phone 2 are collectively referred to as "Devices", which is currently stored, in law enforcement possession, at 211 E 7th Avenue Suite #420, Eugene, Oregon 97401), as described in Attachment A hereto, and the extraction of electronically stored information from the Devices, as described in Attachment B hereto.   As set forth below, I have probable cause to believe and do believe that the items set forth in Attachment B constitute evidence of the fruits and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846.

3.       This affidavit is intended to show only that there is sufficient probable cause for

**Affidavit of Kristofer Strubel**                                                                                      **Page  2**

the requested warrant and does not set forth all of my knowledge about this matter.   The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

### Applicable Law

4.      Title 21, United States Code, Section 841(a)(1) provides that it shall be unlawful for any person to possess, with intent to distribute, controlled substances.

5.      Title 21, United States Code, Section 846 provides that is shall be unlawful to engage in a conspiracy to commit any violation of Title 21, United States Code, Section 841(a)(1).

### Statement of Probable Cause

6.      On July 30, 2025, at approximately 9:47 a.m., an Oregon State Police K9 Lieutenant who was with his K9 was on patrol, in uniform, operating a marked patrol vehicle near mile post 226 on Interstate 5 (I-5) which is a public highway within the confines of Linn County, Oregon.   The Lieutenant observed a Silver 2024 Nissan Altima, bearing Washington plate CCY1131 traveling North on I-5.   He observed the vehicle following too closely to the vehicle in front of it.   As the Lieutenant pulled behind the vehicle at mile post 228, it immediately took the exit, failing to signal 100 feet prior to making a lane change.   Based on my training and experience, it is common that people trying to avoid law enforcement will take the closest exit to avoid contact from law enforcement.

**Affidavit of Kristofer Strubel**                                                    **Page  3**

7.     The Lieutenant activated his emergency lights, initiating a traffic stop for following too closely and failure to signal 100 feet prior to making a turn.   The vehicle yielded on the shoulder.   The Lieutenant approached the vehicle.   The driver identified himself as Campos Roman and the passenger identified himself as Freites-Mosquera.   Freites-Mosquera was visibly nervous, clasping his hands and breathing heavily.

8.     Campos Roman told the Lieutenant he was running out of gas, which is why he took the exit.   However, the Lieutenant observed that he still had a ¼ of a tank left.   Campos Roman also told the lieutenant he was coming back from Los Angeles after attending a wedding for the past one day.   The trooper observed snack wrappers and trash, which indicated they had been traveling long distances.

9.     The Lieutenant was provided with the rental agreement that showed the vehicle was rented on July 27, 2025, by Campos Roman in Everett, Washington, and was due back on July 31, 2025.   License plate reader (LPR) data on the vehicle indicated it had passed near Tolleson, Arizona, on July 28, 2025, at approximately 11:11 p.m., and again on July 29, 2025, at approximately 1:49 a.m.   I know based on my training and experience that it's common practice for drug trafficking organizations (DTO's) and people involved in the trafficking drugs to use rental vehicles to hide their identity and travels due to the registration not coming back to them. This is used because it's common knowledge that law enforcement has access to license plate readers and often use them to further investigations.   Using a rental vehicle benefits the DTO because law enforcement will not be able to confirm travel patterns unless they contact the operator and get a travel or rental timeline.

10.     The Lieutenant recontacted Campos Roman and asked if they had been anywhere

**Affidavit of Kristofer Strubel**                                                                                          **Page  4**

else other than Los Angeles.   Campos Roman denied any other travel.   Campos Ramon was then asked for consent to search the vehicle.   He indicated he did not want his vehicle searched. The Lieutenant asked if there were any drugs in the vehicle.   Campos Roman told him there was a user amount of methamphetamine in his wallet and volunteered to provide it to the Lieutenant.   During the Lieutenant's contact with the Campos Roman and Freites-Mosquera, both were texting on what is believed to be the Devices to unknown people.   The Lieutenant asked Freites-Mosquera how long they were in Los Angeles, and he said three days, which was different than what Campos Roman earlier provided.

11.     While the Lieutenant was asking for consent, additional law enforcement officers arrived to assist.   Law enforcement had both Campos Roman and Freites-Mosquera step out of the vehicle.   While having the occupants exit the vehicle the Lieutenant asked Campos Roman if he knew the passenger's name and he told him he only knew his first name "Eduar".     The Lieutenant then deployed his drug K9 Pesco Bill to the exterior of the vehicle.

12.     K9 Pesco Bill alerted to the odor of drugs coming from the trunk compartment of the vehicle and the passenger door seam.     Law enforcement conducted a search of the vehicle and found in the trunk two black garbage bags filled with approximately 70 cylinder shaped bindles wrapped in clear plastic wrap of suspected methamphetamine each weighing approximately 1.2 pounds, a red grocery bag filled with two kilo shaped bricks of suspected cocaine, and a fan box filled with 4 cylinder shaped bindles wrapped in black electric tape of suspected fentanyl m/30 pills and approximately 10 oddly shaped kilogram sized packages of suspected methamphetamine, and a red grocery bag with 2 kilogram-sized brown tape wrapped packages of suspected cocaine.

**Affidavit of Kristofer Strubel**                                                                            **Page  5**

13.     Law enforcement later conducted a field test using a TruNarc and confirmed the clear plastic cylinders as containing methamphetamine, the electric tape wrapped cylinders with pills as containing fentanyl, and the brown kilogram-sized bricks as containing cocaine.   The total packaged weight of the methamphetamine was approximately 110 pounds, the total packaged weight of the cocaine was approximately 5.6 pounds, and the total packaged weight of the fentanyl m/30 pills was approximately 4.4 pounds.   Based on my training, and experience these are amounts for distribution with the street value of these combined drugs easily exceed $300,000.

14.     Campos Roman and Freites-Mosquera were both placed into custody, the Devices were seized and transported with the drugs to the Albany State Police Office. Campos Roman was taken into an interview room and immediately invoked his Miranda rights.   Freites-Mosquera was taken into an interview room and initially waived his Miranda rights.   He denied any knowledge of drugs but admitted to using cocaine on the weekends.   Freites-Mosquera told law enforcement that he and Campos Roman were together for the entire trip except for bathroom breaks and grabbing beer, which was no longer than 20 minutes.

15.     Law enforcement brought the Devices to Freites-Mosquera and asked for consent to search his device.   Freites-Mosquera identified Target Cell Phone 2 which is a Samsung inside a black case that had "Go To" inscribed at the bottom with a lock screen showing a fingerprint emblem and the words "LAGG" followed by a heart emoji as his.   Freites-Mosquera identified Target Cell Phone 1 the Samsung with a blue case that had the a Captain America Shield inscribed with the words "CAPTAIN AMERICA" under it as belonging to Campos Roman.   Freites-Mosquera initially provided verbal consent and provided a thumb

**Affidavit of Kristofer Strubel**                                                    **Page  6**

print for Target Cell Phone 2.   When law enforcement asked for his pin, he revoked consent.

When law enforcement told Freites-Mosquera that LPR data indicated his vehicle was in

Arizona he then invoked and asked for a lawyer.

16.    The Devices are currently in the lawful possession of the DEA.   It came into the

DEA's possession in the following way: seized incident to arrest.

17.    The Device are currently in storage at in a temporary non-drug evidence locker at

the Eugene Resident Office located at 211 E 7th Avenue Suite #420, Eugene, Oregon 97401.   In

my training and experience, I know that the Devices have been stored in a manner in which its

contents are, to the extent material to this investigation, in substantially the same state as they

were when the Device first came into the possession of the DEA.

18.    Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.    *Wireless telephone*.   A wireless telephone (or mobile telephone, or

cellular telephone) is a handheld wireless device used for voice and data communication through

radio signals.   These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones.   A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of

calls made to and from the phone.   In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.   These capabilities include: storing names and

phone numbers in electronic "address books"; sending, receiving, and storing text messages and

email; taking, sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on personal

**Affidavit of Kristofer Strubel**                                                                    **Page  7**

calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    *Digital camera*.   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    *Portable media player*.   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    *GPS*.   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains historical records of the locations where it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such

**Affidavit of Kristofer Strubel**                                                                    **Page  8**

navigation.   The Global Positioning System (generally abbreviated as "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e. *PDA*.   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f. *Storage medium*.   A storage medium is any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

   g. *IP address*.   An Internet Protocol address (or simply "IP address") is a

**Affidavit of Kristofer Strubel**            **Page 9**

unique numeric address used by computers on the Internet.   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    h. *Internet*.   The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  19. Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA."   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

  20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

  21. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.   There is probable cause to believe that this

forensic electronic evidence will be on the Devices because, based on my knowledge, training, and experience, I know:

        a.      Data on the Devices can provide evidence of a file that was once on the Device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the device at a relevant time. Further, forensic evidence on a device can show how and when the device was accessed or used. Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the device user. Last, forensic evidence on a device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information on a device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a computer (e.g., logs

**Affidavit of Kristofer Strubel**                                         **Page 11**

indicating that the incriminating information was accessed with a particular program).

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

      22.    *Nature of examination*.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devics consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

**Affidavit of Kristofer Strubel**          **Page  12**

23.     The initial examination of the Devices will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.   If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.   The government shall complete this review within 180 days of the date of execution of the warrant.   If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

24.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Devices or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

25.     If an examination is conducted, and it is determined that the Device does not contain any data falling within the ambit of the warrant, the government will return the Device to its owner within a reasonable period of time following the search and will seal any image of the Device, absent further authorization from the Court.

26.     If the Devices contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

**Affidavit of Kristofer Strubel**                                                    **Page  13**

27.     The government will retain a forensic image of the Devices for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

28.     *Manner of execution*.   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**Conclusion**

29.     Based on the foregoing, I have probable cause to believe, and I do believe, that the Devices described in Attachment A contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, as set forth in Attachment B.   I therefore request that the Court issue a warrant authorizing a search of the Devices described in Attachment A for the items listed in Attachment B and the seizure and examination of any such items found.

/ / /

/ / /

/ / /

/ / /

**Affidavit of Kristofer Strubel**                                                                              **Page  14**

30.    Prior to being submitted to the Court, this affidavit, the accompanying

application, and the requested search warrant were all reviewed by Assistant United States

Attorney (AUSA) Joseph H. Huynh. I was informed that it is AUSA Huynh's opinion that the

affidavit and application are legally and factually sufficient to establish probable cause to

support the issuance of the requested warrant.

_By phone pursuant to Fed. R. Crim. P. 4.1_
KRISTOFER STRUBEL
Task Force Officer, DEA

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at

9:35 _____ a.m. / p.m. on August __15_____, 2025.

HONORABLE MARK D. CLARKE
United States Magistrate Judge

**Affidavit of Kristofer Strubel**                                    **Page 15**

## ATTACHMENT A

## Devices to Be Searched

1.      Target Cell Phone 1: A light gray Samsung cellular phone inside a blue case that had a Captain America Shield and the words "CAPTAIN AMERICA" under it, seized from Campos Roman, Jesus hereinafter "Campos Roman" on July 30, 2025 (hereinafter, Target Cell Phone 1),

2.      Target Cell Phone 2: A black Samsung cellular phone inside a black case that had "Go To" inscribed at the bottom with a lock screen showing a fingerprint emblem and the words "LAGG" followed by a heart emoji, seized from Freites-Mosquera, Eduar hereinafter "Freites-Mosquera" on July 30, 2025 (hereinafter Target Cell Phone 2),

3.      Target Cell Phone 1 and Target Cell Phone 2 are collectively referred to as "Devices", which is currently stored, in law enforcement possession, at 211 E 7th Avenue Suite #420, Eugene, Oregon 97401.



**ATTACHMENT B**

**Items to Be Seized**

1.      All records on the Devices described in Attachment A that relate to violations of

21 U.S.C. §§ 841(a)(1) and 846 and involve Campos Roman and Freites-Mosquera since July 1.

2025 to the present including:

>       a.      Text messages, photographs, video recording, phone calls, phone call logs,
>
> other applications data stored in the cellular telephones including those from Facebook
>
> Messenger, Snapchat, WhatsApp, Signal, and others.
>
>       b.      Lists of customers and related identifying information.
>
>       c.      Types, amounts, and prices of drugs trafficked as well as dates, places, and
>
> amounts of specific transactions.
>
>       d.      Information related to sources of drugs (including names, addresses,
>
> phone numbers, or any other identifying information).
>
>       e.      Information recording Campos Ramon's and Freites-Mosquera's schedule
>
> or travel from July 1, 2025 to the present.
>
>       f.      Bank records, checks, credit card bills, account information, and other
>
> financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history.

3.      Records evidencing the use of the Internet, including:

>       a.      Records of Internet Protocol addresses used.

**Attachment B**                                                                                   **Page 1**

b.      Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

c.      Records of data storage accounts and use of data storage accounts.

4.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## Search Procedure

5.      The examination of the Devices may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

6.      The initial examination of the Devices will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.  If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.  The government shall complete this review within 180 days of the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

7.      If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Devices or image do not contain any data falling within

**Attachment B**                                                                                                          **Page 2**

the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

8.     If an examination is conducted, and it is determined that the Devices does not contain any data falling within the ambit of the warrant, the government will return the Devices to its owner within a reasonable period of time following the search and will seal any image of the Devices, absent further authorization from the Court.

9.     If the Devices contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

10.     The government will retain a forensic image of the Devices for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Attachment B**                                                                                           **Page 3**